UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| MATTHEW PRICHARD,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, AS ARISTRATOR AND FIDUCIARY OF THE IBM LONG-TERM DISABILITY PLAN, AND THE IBM LONG-TERM DISABILITY PLAN,<br><br>　　　　Defendants. | Case No: C 10-3313 SBA<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Dkt. 28, 29 |

　　　　Plaintiff Matthew Prichard ("Plaintiff") brings this action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, et seq., to challenge the denial of his claim for long-term disability insurance benefits by Defendant Metropolitan Life Insurance Company ("MetLife"), the administrator for the IBM Long Term Disability Plan ("Plan"). The parties are presently before the Court on the parties' cross-motions for judgment under Federal Rule of Civil Procedure 52. Dkt. 28, 29. After consideration of the parties' briefs and the record presented, the Court enters the following Findings of Fact and Conclusions of Law. The Court finds that MetLife did not abuse its discretion in denying Plaintiff's claim for benefits.[1]

---

[1] The Court finds this matter suitable for resolution without oral argument. See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

# FINDINGS OF FACT

## EDUCATIONAL AND EMPLOYMENT HISTORY

1. Plaintiff is an adult male born on March 17, 1969. Admin. Record ("AR") 880. In 1991, Plaintiff earned a Bachelor's degree from Genesco College in New York in Psychology, with a minor in English. AR 791.

2. In November 1998, Plaintiff began working for IBM as a Systems Administrator. He became a Project Manager in August of 2000, and then a Service Delivery Representative, which was the last job he held with IBM prior to his disability. AR 788-791.

## MEDICAL HISTORY

3. In 2002, Plaintiff began having seizures which caused him to lose consciousness. The seizures were eventually controlled by medication and ceased in 2004. AR 819-21.

4. In April 2006, Plaintiff was referred to Dr. Peter Linfoot, an endocrinologist, who noted that Plaintiff had noticed worsening fatigue, constipation, cold intolerance, weight gain, inability to focus, decreased libido and worsening depression. AR 831-32.

5. In 2006, Plaintiff was referred to a rheumatologist, Dr. Rajiv Dixit. Between July 17, 2006, and August 13, 2009, Plaintiff was examined by Dr. Dixit on nineteen occasions. Dr. Dixit's medical records note varying degrees of pain, fatigue, headache, sleeping problems, and cognitive dysfunction on each of those visits. AR 471-489. Dr. Dixit also noted that Plaintiff had a one to two year history of progressive exhaustion and fatigue in association with widespread joint and muscle pain, and believed that Plaintiff was suffering from fibromyalgia. AR 489.[2]

6. Between 2006 and 2008, Plaintiff was also treated at various times by Dr. Robert Algar, a neurologist, who noted complaints of migraines, sleep disturbance,

---

[2] Fibromyalgia is a rheumatic disease with symptoms that include significant pain and fatigue, tenderness, stiffness of joints, and disturbed sleep. See DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 863 n.1 (4th Cir. 2011) (internal quotations omitted).

dizziness, and feelings of pins and needles in the extremities. AR 523-530. Plaintiff's internist, Dr. Michael Tempkin, also noted complaints of headache, left eye pain, dizziness, and numbness in the right upper extremity. AR 696. Additionally, between August 2007 and December 2008, Plaintiff saw Dr. Khurran Durrani, a psychiatrist, for problems with depression. AR 719.

### IBM'S LONG-TERM DISABILITY BENEFITS PLAN

7. During the course of his employment at IBM, Plaintiff became a participant in the Plan. AR 102-112. MetLife funds benefits under the Plan and is its fiduciary. Compl. ¶ 6, Dkt. 1.

8. Participants of the Plan are eligible to receive long term disability benefits if they satisfy the definition of "disability." Under the Plan, "disabled" means that, during the first 12 months after the elimination period, the participant cannot perform the important duties of his or her regular occupation because of a sickness or injury. After 12 months, disabled means that because of sickness or injury, the participant cannot perform the important duties of any other gainful occupation for which he or she is reasonably fitted by education, training or experience. AR 102.

9. The Plan limits benefits for the following types of disabilities to a maximum payment period of 24 months:

> **Mental or Nervous Disorder or Disease except for:**
> - schizophrenia;
> - dementia; or
> - organic brain disease.
>
> Mental or Nervous Disorder or Disease means a medical condition which meets the diagnostic criteria set forth in the most recent edition of the *Diagnostic and Statistical disability begins. A condition may be classified as a Mental or Nervous Disorder or Disease* regardless of its cause.
>
> **Chronic Fatigue Syndrome**, and related conditions.
>
> **Neuromusculoskeletal and soft tissue disorder**, including but not limited to, any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles, unless the disability has objective evidence of:

- Seropositive Arthritis (an inflammatory disease of the joints supported by clinical findings of arthritis plus positive serological tests for connective tissue disease)
- Spinal tumors, malignancies or vascular malformations components of the bony spine or spinal cord)
- Vascular Malformations(abnormal development of the blood vessels)
- Radiculopathies (disease of the peripheral nerve roots supported by objective clinical findings of nerve pathology)
- Myelopathies (disease of the spinal cord supported by objective clinical findings of spinal cord pathology)
- Traumatic Spinal Cord Necrosis (injury or disease of the spinal cord resulting from traumatic injury with resultant paralysis)
- Musculopathies (disease of muscle fibers, supported by pathological findings on biopsy or electromyography (EMG)

AR 107.

### PLAINTIFF'S DISABILITY CLAIM

10. On May 12, 2006, Plaintiff ceased working at IBM due to major depressive disorder, obsessive compulsive disorder, dysthymic disorder, anxiety, fatigue, pain, headache, memory problems and difficulty concentrating.

11. On January 19, 2007, Plaintiff submitted a claim for long-term disability benefits to MetLife and the Plan, based on the aforementioned conditions. AR 881-882. To evaluate the claim, MetLife obtained all of Plaintiff's medical records, including those from his mental health professionals: Dr. Tempkin (internal medicine), Dr. Durrani (psychiatry), Dr. Algar (neurology), and Dr. Dixit (internal medicine/rheumatology).

12. MetLife referred Plaintiff's claim for two Independent Physician Consultant ("IPC") reviews from Dr. Kenneth Busch, a Board-certified psychiatrist, and Dr. Harold Schechter, a Board-certified internist. On October 29, 2007, Dr. Busch reported that the evidence showed that Plaintiff was severely depressed and disabled as of July 20, 2006, from a psychiatric perspective. AR 752-59.

13. In his October 22, 2007 report, however, Dr. Schechter stated that, after reviewing Plaintiff's medical records, he found insufficient evidence to support any

physical impairment supporting an inability to perform a sedentary occupation.  AR 762-769.  Dr. Schechter disagreed with Dr. Dixit's diagnosis of fibromyalgia as being medically unsupported.  Id.  Dr. Schechter reported that Dr. Dixit's notes showed a history of one to two years of progressive exhaustion, fatigue, and associated widespread muscle and joint pain, as well as sleep disturbance and tender points, along with a diagnosis of fibromyalgia.  AT 765.  However, Dr. Schechter found that there was no evidence of inflammation, with the normal acute phase reactants, negative rheumatoid factor, and ANA (antinuclear antibody), and also noted that there had not been a neuromuscular examination that noted any specific deficits of performance.  Id.  Dr. Schechter concluded that "there was a lack of documentation in the above reports that would indicate an inability to perform the duties of his sedentary position."  AR 769.  He left several messages to speak with Dr. Tempkin but never received a return call.  AR 767.

14. In addition to the IPCs, MetLife considered the results of an examination of Plaintiff made on October 8, 2007 by Dr. Suresh Mahawar.  Dr. Mahawar is Board-certified in physical medicine and rehabilitation and in internal medicine who examined Plaintiff as part of his Social Security Disability Income ("SSDI") claim.  AR 700-704.[3]  After taking Plaintiff's history and also performing an examination, Dr. Mahawar reported that Plaintiff's diagnoses were fatigue and joint pain with fibromyalgia, depression and anxiety, and a history of seizure disorder that was stable.  AR 701.  Despite his diagnoses, Dr. Mahawar did not conclude that Plaintiff was physically disabled.  AR 704.  Dr. Mahawar reported that there was no muscle atrophy in any of the four extremities, and no evidence of redness, warmth, or effusion of any joint.  Id.  Dr. Mahawar found that Plaintiff could sit for six hours in an eight-hour workday, and sit or stand two hours in an eight-hour workday.  Id.

15. On or about December 6, 2007, MetLife approved Plaintiff's long-term disability claim, based on a psychiatric disability.  AR 207-210, AR 295.

---

[3] The Plan requires claimants to apply for SSDI benefits and to pursue their claims before an administrative law judge. ("ALJ").  AR 36.

**INITIAL CESSATION OF BENEFITS**

16.     On May 19, 2008, MetLife informed Plaintiff that it was terminating his benefits as of June 19, 2008, due to the 24-month limitation on benefits for Mental or Nervous Disorder. AR 628-29. MetLife invited Plaintiff to submit any medical information that would show that other medical (i.e., non-psychiatric) conditions that currently prevented him from working in any occupation. AR 628. However, Plaintiff did not submit any additional information.

17.     Despite Plaintiff's inaction, MetLife obtained additional, updated medical records for its continued evaluation of Plaintiff's claim. Updated records from Plaintiff's psychiatrist, Dr. Durrani, showed that Plaintiff's mental health issues were stable and controlled by medication as of March and April 2008. AR 719-720.

18.     MetLife also referred Plaintiff's claim to another IPC for a review of any functional restrictions and limitations Plaintiff might have based on possible fibromyalgia. On May 27, 2008, Dr. Payne, Board certified in internal medicine and rheumatology, issued a report following his review of Plaintiff's file. AR 623-627. He noted that Plaintiff "is a 39 year old male with a history of major depression, fibromyalgia, thyroiditis and seizures." AR 623. However, he opined that "[t]he onset and clinical course is not clearly noted in the records." Id. In addition, he did not find sufficient support to conclude that Plaintiff was unable to work:

> Examination findings throughout the medical record data reviewed reveal only presence of described tender points. There's no mention of synovitis, weakness, atrophy, and no evidence of joint damage or destruction. I do not see mention of any cardiac, pulmonary, gastrointestinal, or neurological findings that would be expected to be producing restrictions and limitations.

AR 623. Dr. Payne spoke with Dr. Tempkin's office which reported that it had nothing to add to the information in the medical records and that they would not participate in a teleconference. AR 624-625.

19.     On May 28, 2008, MetLife sent the IPC report to Plaintiff's treating physicians for review and comment. No response was received.

20. On June 12, 2008, MetLife informed Plaintiff that his benefits would be terminated as of July 12, 2008, because there was insufficient medical evidence to support benefits for a continued "disability," within the meaning of the Plan, beyond that date. AR 897-899.

### INITIAL APPEAL

21. On December 8, 2008, Plaintiff appealed MetLife's termination of his benefits. AR 612-14.

22. After receiving Plaintiff's appeal, MetLife referred the matter for another IPC review, this time to Dr. Tanya C. Lumpkins, who is Board-certified in rheumatology and internal medicine. AR 572-577. In her report, dated February 6, 2009, Dr. Lumpkins indicated that she reviewed Plaintiff's medical file and spoke with Plaintiff's treating physicians, Dr. Dixit and Dr. Algar. AR 572-573. She noted Dr. Dixit's belief that Plaintiff suffers from fibromyalgia and depression and that he is unable to work in his current position. AR 573, 575. However, Dr. Lumpkins opined that the medical records did not support a diagnosis "of sufficient severity that would preclude the claimant from working in a full time capacity from 7/12/08 forward." AR 575. She further noted that all of the relevant test results and examinations were unremarkable. AR 576. Notably, Dr. Lumpkins opined that Plaintiff should refrain from working at heights, driving a car or working with heavy machinery; however, such restrictions were based on the report of medications that had been prescribed, not on any documented musculoskeletal deficit established by the medical records. AR 577.

23. On February 19, 2009, MetLife rejected Plaintiff's appeal on the basis that the medical evidence did not support the conclusion that he suffered from a physical disability that prevented him from working. AR 518-522.

### SECOND APPEAL

24. On August 17, 2009, Plaintiff again appealed the termination of his benefits and submitted updated records from Dr. Dixit. AR 462.

25. MetLife referred the claim to an additional IPC for review of the updated records from Dr. Dixit. AR 440-448. On October 15, 2009, Dr. J. Collins, who is Board-certified in Occupational and Environmental Medicine, provided a report based on his review of the medical records. Id. Dr. Collins was asked to provide an opinion as to whether functional limitations and restrictions were supported beyond July 12, 2008, from a physical standpoint. AR 456. Dr. Collins noted that Plaintiff has had many subjective complaints over the years, but that the documented physical examination results were unremarkable. Id. Dr. Collins reported that although Plaintiff reported suffering from tender points, there were few other abnormalities that could support inability to perform sedentary work beyond July 12, 2008. Id. Dr. Collins concurred with the other physicians, including Dr. Mahawar (the physician who examined Plaintiff in relation to his SSDI claim), who similarly reported that Plaintiff was not disabled from performing sedentary work. Id.

26. On November 24, 2009, MetLife upheld its determination that benefits were not payable beyond July 12, 2008. AR 371-375. MetLife found that the medical evidence did not support that Plaintiff was physically disabled as defined by the Plan, as there was insufficient support for an inability to perform sedentary work. Id.

### THIRD APPEAL

27. On March 3, 2010, Plaintiff, through his attorney, submitted documents, requesting MetLife to review and reconsider its claim determination. AR 383-384. These documents included a December 16, 2009, letter from Dr. Dixit in which he noted widespread pain and tender points in his notes, which he believed were sufficient to meet the criteria for a diagnosis of fibromyalgia. Counsel also tendered a January 12, 2010, ALJ opinion granting Plaintiff's SSDI claim. Id. In his ruling, the ALJ found Plaintiff disabled as of May 13, 2006, by a combination of psychological and physical issues. MetLife agreed to review the additional materials, and requested an addendum review by the IPC physician, Dr. Collins, to determine whether the new information changed his prior opinions.

28. On April 6, 2010, Dr. Collins provided an addendum report, concluding that the information did not change his prior opinions. AR 316-320. Dr. Collins opined that Dr. Dixit's reliance on the presence of tender points alone as sufficient to establish that Plaintiff had disabling fibromyalgia was not well taken. AR 318-319. Tender points, standing alone, do not establish restrictions and limitations, and it remained undocumented how, in the view of the treating doctor, the presence of tender points would physically translate into an inability to perform sedentary activities. Id. As to the ALJ's opinion, Dr. Collins noted that a state agency psychiatrist had examined Plaintiff and found that his ability to understand, recall, carry out complex instructions was poor, and that therefore Plaintiff was unable to perform job duties without interruption, due to psychologically-based symptoms. AR 319. Dr. Collins further noted that the ALJ felt that because Plaintiff's doctors had accepted his pain complaints as genuine (which was inferred from the doctor's prescription of pain medications), Plaintiff should be regarded as credible as to pain complaints. Id. Dr. Collins disagreed that the mere fact that pain medications were prescribed, was sufficient to show, as a medical matter, that Plaintiff was functionally restricted from working. Id.

29. On April 15, 2010, MetLife upheld its determination that benefits were not payable beyond July 12, 2008 (after payment of the maximum 24 months of mental illness benefits), due to Plaintiff's failure to provide clinical evidence supporting the existence of disabling restrictions and limitations from a physical condition. AR 313-315.

**PROCEDURAL HISTORY**

30. On July 28, 2010, Plaintiff filed the instant action in this Court against MetLife and the Plan seeking to challenge the denial of his claim for long-term disability benefits. Dkt. 1. The case was initially assigned to then Magistrate Judge Edward Chen, but was reassigned to the undersigned on December 15, 2010. Dkt. 14.

31. On January 31, 2012, Plaintiff and MetLife filed cross-motions for judgment. Dkt. 28, 29. The parties submitted their respective reply briefs on February 21, 2012. The motions are fully briefed and are ripe for adjudication.

## CONCLUSIONS OF LAW

### LEGAL STANDARD

32. Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately." In a Rule 52 motion, as opposed to a Rule 56 motion for summary judgment, the Court does not determine whether there is an issue of material fact, but actually decides whether the plaintiff is disabled under the policy. See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1095 (9th Cir. 1999). The Court is to "evaluate the persuasiveness of conflicting testimony," and make findings of fact. Id. This is considered a "bench trial on the record," which may "consist[] of no more than the trial judge rereading [the administrative record]." Id.

### CONTENTIONS

33. ERISA allows an individual who is denied benefits under his or her employer's group long-term disability policy to contest that denial in federal court. See 29 U.S.C. § 1132(a)(1)(B); Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 108 (2008). Depending on language of the ERISA plan at issue, a claims administrator's decision to deny benefits may be reviewed de novo or under an abuse of discretion standard. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 111-12 (1989). If an ERISA benefits plan gives the plan's administrator discretionary authority to determine eligibility for benefits, federal courts review the administrator's decision under an abuse of discretion standard. Conkright v. Frommert, 130 S.Ct. 1640, 1646 (2010). Otherwise, such decisions are reviewed de novo. Id.

34. The parties disagree on the applicable standard of review. Plaintiff contends that MetLife's decision is subject to de novo review, while MetLife argues that the deferential abuse of discretion standard applies. In resolving this dispute, the starting point requires the Court to determine which document comprises the Plan document—and then determine whether that document confers discretion upon the administrator.

35. "Every employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). "The 'written instrument' requirement is intended to ensure that participants are on notice of the benefits to which they are entitled and their own obligations under the plan." Wilson v. Moog Auto., Inc. Pension Plan & Trust for U.A.W. Emps., 193 F.3d 1004, 1008 (8th Cir. 1999). ERISA regulations also require the employer to provide its employees with a written "summary plan description" or "SPD." 29 C.F.R. § 2520.102-3. The SPD must be accurate, comprehensive, and understandable to the average participants, and must disclose the benefits in detail, how the plan operates, how to file claims, and the participants' rights and responsibilities under the plan. See Gonzales v. Unum Life Ins. Co. of Am., — F. Supp. 2d —, 2012 WL 987290, at *5 (S.D. Cal., Mar. 22, 2012) (citing ERISA: A Comprehensive Primer § 2.02[A] at 2-9 (Paul Schneider & Brian Pinheiro, eds., 4th ed. 2012)).

36. Here, MetLife contends that its SPD, which is presented in a booklet styled as "About Your Benefits – Income & Asset Protection," AR 89-167, constitutes the Plan document, and that such document specifically provides that "Plan fiduciaries shall have *discretionary authority* to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan," AR 112 (emphasis added). MetLife contends that this provision unambiguously grants it discretionary authority over claims administration matters. Plaintiff does not respond to this contention specifically, but instead argues that the governing plan document is the insurance certificate issued by MetLife, AR 1-52, which lacks a grant of discretion to the Plan in evaluating claims. However, Plaintiff offers no evidence to support that contention. In addition, MetLife has presented the declaration of Christopher J. Zychowicz, IBM's Manager of

1  Health Benefits Delivery & Operations, who confirms that the booklet functions as both the

2  SPD and formal plan document for the Plan.  Zychowicz Decl. ¶¶ 2-3, Dkt. 32.[4]

3        37.    Irrespective Mr. Zychowicz's declaration, it is clear from the record that the

4  SPD, and not the insurance certificate, constitutes the Plan document.  Unlike the

5  certificate, the 78-page booklet provides extensive detail regarding, inter alia, the

6  requirements for eligibility under the Plan, the nature of the benefits and how to obtain

7  benefits under the Plan.  AR 92-94.  Moreover, any doubts regarding the controlling nature

8  of the SPD booklet are laid to rest in its first paragraph, which provides:  "The Plan

9  Administrator retains exclusive authority and discretion to interpret the terms of *the benefits*

10  *plans described herein*."  AR 90 (emphasis added).

11        38.    Based on the record presented, MetLife has shown that the Plan—as set forth

12  in the SPD—unambiguously delegates the discretion to determine whether a claimant is

13  eligible for long-term disability benefits.  Abatie v. Alta Health & Life Ins. Co., 458 F.3d

14  955, 963-64 (9th Cir. 2006) (en banc); Salomaa v. Honda Long Term Disability Plan, 642

15  F.3d 666, 670 n.8 (9th Cir. 2011).  Accordingly, the Court will review MetLife's denial of

16  Plaintiff's claim for long-term disability benefits under the abuse of discretion standard.

17        39.    "Under the deferential abuse of discretion standard of review, 'the plan

18  administrator's interpretation of the plan will not be disturbed if reasonable."  Day v. AT &

19  T Disability Income Plan, 685 F.3d 848, 852 (9th Cir. 2012) (quoting Conkright, 130 S.Ct.

20  at 1651).  "ERISA plan administrators abuse their discretion if they render decisions

21  without any explanation, construe provisions of the plan in a way that conflicts with the

22  plain language of the plan or rely on clearly erroneous findings of fact."  Id. (internal

23  quotations, alterations and citations omitted).

---

[4] Plaintiff objects to the Zychowicz declaration on the grounds of lack of foundation and hearsay.  The foundation objection is overruled, as Mr. Zychowicz clearly states that he oversees the administration of IBM's various welfare and benefit plans, of which the Plan is one.  Id. ¶ 1.  The Court also overrules Plaintiff's vague and non-specific hearsay objection.

40. Where, as here, the plan administrator also is the source of funding for the plan, the structural conflict of interest is a factor to be considered in that review. Metro. Life Ins. Co., 128 S.Ct. at 2350-51; Abatie, 458 F.3d at 968-69. Nonetheless, the Supreme Court has reiterated that under Metropolitan Life, "a deferential standard of review remains appropriate even in the face of a conflict." Conkright, 130 S.Ct. at 1646 (citing Metro. Life, 554 U.S. at 111).

41. The gist of Plaintiff's claim is that MetLife erred in failing to find that he is totally disabled due to fibromyalgia. In support of this claim, Plaintiff points principally to Dr. Dixit's opinion that Plaintiff was suffering from disabling condition due to fibromyalgia; his own subjective complaints regarding his condition; and the finding of a Social Security administrative law judge who awarded SSDI benefits to Plaintiff. See AR 328-330, 471-489, 588-592. Plaintiff contends that in light of this evidence, it was unreasonable for MetLife to deny his claim for long-term disability benefits. Pl.'s Mot. at 21.

42. Despite Plaintiff's intimations to the contrary, the resolution of this action does not turn on whether Plaintiff has evidence to support his claim of disability, which he undoubtedly does. Rather, as noted, the salient question is whether MetLife abused its discretion in deciding to deny long-term disability benefits to Plaintiff. Under this deferential standard, the Court finds that MetLife did not abuse its discretion. As set forth above, the record shows that MetLife has ample support from numerous physicians who—after reviewing Plaintiff's medical records and in some instances spoke with Plaintiff's treating physicians—opined that there was insufficient support for a fibromyalgia diagnosis and/or that, irrespective of his diagnosis, he was not unable to perform sedentary work.

43. The Court is not persuaded by Plaintiff's unsupported attempts to discredit the opinions of the physicians on whom MetLife relies in making its benefits determination. See Pl.'s Opp'n at 3-11. For example, Plaintiff asserts that Dr. Lumpkins is biased based on her affiliation with Elite Physicians, Ltd., a subsidiary of Network Medical Review ("NMR"). According to Plaintiff, MetLife stops paying or refuses to pay benefits in 81-

91% of the cases reviewed by NMR, and that such statistics show that NMR is biased against claimants. Plaintiff does not offer any actual evidence to support his argument, but instead, merely cites to Nolan v. Heald College, 745 F. Supp. 2d 916 (N.D. Cal. 2010) (Walker, J.), which allegedly addressed the relationship between MetLife and NMR. In fact, Nolan supports the opposite proposition; there, Judge Vaughn Walker found that "[t]he court does not find these statistics standing alone to be probative of any bias on the part of NMR in its handling of claims from MetLife." Id. at 645. Judge Walker noted that "[i]n order to prove that NMR was biased, [plaintiff] would have to produce statistics showing, for example, that non-NMR physicians, reviewing a pool of claims similar to that referred to NMR, made determinations favorable to beneficiaries at a rate higher than NMR physicians did." Id. Plaintiff has failed to make such a showing in this case.

44. As to the other physicians, Plaintiff complains that their respective reports lacked sufficient explanation to support their respective findings. The Court disagrees. Each physician provided an explanation and analyses to support his or her conclusions, and included their reasons for discounting the findings of Dr. Dixit, the ALJ's decision and the other evidence presented by Plaintiff. But even if Plaintiff were correct that these reports should have included more detail, Plaintiff has failed to demonstrate that they were so deficient so as to render MetLife's reliance on them as the basis for denying benefits unreasonable. See Day, 685 F.3d at 852. Thus, in view of the record, and taking into account the deference afforded to MetLife, the Court finds that MetLife had a reasonable basis for its decision to deny Plaintiff long-term disability benefits.

## CONCLUSION

For the reasons set forth above,

IT IS HEREBY ORDERED THAT:

1. Plaintiff's motion for judgment is DENIED and MetLife's motion for judgment is GRANTED.

2. The Clerk shall close the file and terminate any pending matters.

1 | IT IS SO ORDERED.

2 | Dated: September 28, 2012

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge